MARTHA M. JOHNSON, APPELLEE, v. MODEL STEAM LAUNDRY COMPANY, APPELLANT.

FILED NOVEMBER 26, 1910. No. 16,207.

1. **Master and Servant: ACTION FOR INJURIES: NEGLIGENCE: DIRECTING VERDICT.** In an action by a servant against a master or employer for personal injuries, sustained while engaged in the master's service, it is necessary for the plaintiff to prove by competent evidence that the negligence of the master was the proximate cause of the injury complained of; and where the plaintiff fails to furnish such proof it is the duty of the trial court to direct the jury to return the verdict for the defendant.

2. **Evidence** examined, the substance of it stated in the opinion, and *held* insufficient to sustain a verdict for the plaintiff.

APPEAL from the district court for Douglas county: ABRAHAM L. SUTTON, JUDGE. *Reversed.*

*Greene, Breckenridge & Matters,* for appellant.

*Murdock & Pancoast, contra.*

BARNES, J.

Action in the district court for Douglas county to recover damages for personal injuries sustained by the plaintiff while working in the defendant's laundry. The plaintiff had the verdict and judgment, and the defendant has appealed.

At the close of the evidence the defendant requested the trial court to direct a verdict in its favor, which was denied, and that ruling is now one of the several errors assigned and relied on for a reversal of the judgment. The allegations of negligence set forth in the amended petition, on which the cause was tried, were as follows: (*a*) The failure to furnish a reasonably safe guard upon the mangle on which the plaintiff was working at the time of her injury; (*b*) failure to use care and diligence to keep the machine in a reasonably safe condition; (*c*) failure to warn plaintiff of the danger of the service in which she was engaged; (*d*) operating the mangle at its highest rate of speed; (*e*) failure to use reasonable diligence to repair the mangle and keep it in repair; (*f*) failure to adjust the mangle so that it could be operated at less than its highest rate of speed.

The defendant, by its answer, admitted that the plaintiff was in its employ when she was injured; avers that she was familiar with the risks of her service, and the condition of the machine upon which she was at work; that the injury resulted to her from a risk incident to her employment; that the negligence of the plaintiff, or a fellow servant, or an unavoidable accident, caused the injury complained of; and denied each and every other averment of the plaintiff's petition.

It appears that the plaintiff, at the time of her injury, was a person of mature years, and had been engaged in laundry work, or working in different laundries, for some six years before that time; that her first service in the defendant's laundry commenced about $3\frac{1}{2}$ years before she was hurt; that at the beginning of her services she worked on a sheet mangle about the size of the mangle on which she was working at the time of her injury; that the sheet mangle had a straight stationary guard, with just enough space at the bottom of it to let in the sheets, towels, or other articles that were to go underneath the guard and through the machine; that this mangle was constructed with rollers placed over a steam chest which furnished heat for the ironing, and the rollers pressed the sheets, or whatever articles were being ironed, down upon this steam chest. In short, that it was a machine precisely like the one she was working on at the time of the accident, with the exception that it had a stationary instead of a roller guard. After working upon the sheet mangle for about four months the plaintiff went to work for the Kimball laundry, where she ironed shirt bands, and from there she went back to the defendant's laundry, where she worked for a time on what was called a "coat machine"; that she worked at different laundries in Omaha where she had experience with different mangles; that she finally returned to the defendant, and again went to work upon the sheet mangle, where she had served for about three months prior to her injury; that she went to work on the mangle on which she was hurt on Wednesday before the accident occurred, at about 1 o'clock in the afternoon; that on Thursday morning she fed the mangle from 7 o'clock until noon. On that day there were five girls at work on the machine; two on the same side with the plaintiff, feeding, and three on the other side, folding; and in the afternoon plaintiff folded and some one else fed the machine.

The following testimony, which we quote from the bill of exceptions, will show, in plaintiff's own language, how well she was acquainted with the machine in question: "Q.

When did you first notice on this mangle that there was this revolving guard roller? A. Well, I knew it was a guard roller. Q. Yes; when did you first notice it? A. First notice it—why, it was put there for your hands—to protect your hands; anybody knew that. Q. No, no; when did you first notice that guard roller? A. Why, you would have to pass that mangle when you worked on the sheet mangle; that mangle was (interruption). Q. You had to pass that mangle when you were working on the sheet mangle? A. Yes, sir. Q. And you saw the roller guard on it then? A. Yes, sir. Q. And you knew that was what it was for? A. Certainly. Q. And that was a year or more before you went to work, wasn't it?—before you got hurt on it, I mean? A. Yes, sir. * * * Q. You knew how to feed into that machine, didn't you? A. I was showed how. Q. By whom? A. By the head girl. Q. When were you shown how to feed into that machine? A. When I worked there before. Q. Into this very machine? A. This very machine. Q. So you knew when you went to work on that machine how to feed it? A. I fed with the head girl. Q. And you knew how to feed into that mangle? A. Yes, at that time. Q. And you knew when Mr. Drake told you to go to work on this machine, at that time, you knew how to feed into that mangle? You hadn't forgotten how? You knew how to do it, didn't you? A. Yes. Q. You didn't have to have anybody tell you how, did you? A. No. Q. Now, you knew that this guard, this roller guard, revolved when the other rollers revolved, didn't you? A. Yes. * * * Q. Now, then, the next morning, Friday, which was the day you got hurt, you went to work at 7 o'clock at that mangle, didn't you? A. Yes, sir. Q. You didn't have to be told what to do that morning when you went to work, did you? A. Why—different work, yes. Q. That is, you were told what kind of work was going into the machine? A. Yes, sir. Q. And that was all that was necessary to tell you at that time? You knew what to do with the work that was given you to iron, didn't you? A. Yes. Q. You knew it had to

be fed into the mangle? A. Yes. Q. And you knew how to feed it into the mangle? A. Yes. * * * Q. Now, what kind of work were you ironing that morning? A. A fringed bed spread."

It appears that while feeding this fringed bed spread into the mangle, the plaintiff got her finger caught in the fringe and was unable to get it out. At the time her finger was caught the spread had gone about half way through the machine, and it was necessary to guide it by holding it with the fingers. She further testified as follows: "Q. Just before they got caught in the fringe, what were you doing with your fingers? A. When you feed a spread, or feed anything in the mangle, you can't put it in the mangle and let it go by itself. You have to hold onto it. Q. You were guiding it there with your fingers, were you? A. The mangle takes it and you have to hold it. Q. You were guiding it through the mangle with your fingers, were you? A. Yes, sir. Q. That was a part of your business, was it? That was part of the work you had to do? A. Yes. Q. And you knew that before that morning, didn't you? All your experience had taught you that? A. Taught me what? Q. That that was what you had to do, guide the articles through the mangle; when feeding you have to keep them from wrinkling? A. Certainly. Q. And at the time your fingers got caught that was what you were doing? A. Yes, sir. Q. And that was what you were there for—what you were hired for? A. Yes, sir. Q. Now, how far was your finger, your hand, from the guard when you first became aware of the fact that you were caught there? A. Well, the spread was about half way in the mangle. * * * Q. Now, Miss Johnson, can't you state how it was caught? A. Well, it was caught in the fringe and pulled me in the mangle; that is all I know. Q. That is all you know; you don't know how it was caught? A. It was caught in the fringe, that is all I know. Q. And you don't know how it came to get caught, do you? A. No, sir."

It further appears that there was a lever on this man-

gle, controlled by the operator, to start and stop it; and the speed at which the rollers would go was also subject to the control of the operator. The plaintiff herself did not fix the speed on the morning she was hurt, but it was fixed by another girl, who was her fellow servant, working upon the same machine at the time of her injury. When the bed spread started through the machine it was bound to go clear through, and anything fastened to or caught in the spread would have to go through with it unless the mangle was stopped. It seems clear, therefore, that if the machine had been equipped with a stationary guard it would not have prevented the injury, for in that case the plaintiff's hand would have been broken, torn and lacerated instead of being bruised and burned, as was disclosed by the evidence.

The plaintiff testified many times that she relied upon the guard to protect her from being hurt by getting her hands in the roller. She said she was not afraid of getting her hand caught, the guard was there to protect it, and she was positive in her statement that if the guard had stayed down in the proper place her hand would not have gone in. She further said that it was necessary in feeding into the mangle to keep her hands close up to the machine, and the guard roller was there as a warning as well as a guard.

It thus appears beyond question that the plaintiff was instructed in regard to her work; that she knew how to operate the mangle; that she knew what the roller guard was for; that she had used machines with both roller and stationary guards; that she knew the speed of the rollers was regulated by the operator working with her, and who was her fellow servant. Neither she nor any other witness testified that the mangle was defective, that the roller guard was defectively attached, and her sole contention appears to be that the mangle should have been supplied with a stationary guard instead of the roller guard.

The testimony which we have quoted shows exactly how her hand was drawn into the machine, but it does not dis-

close how her fingers became entangled in the fringe of the bed spread so that she could not extricate them. It appears that when she became aware of the fact that her hand was caught the bed spread was about half way through the mangle, and her fingers were a foot or more away from the guard roller; that she called to Miss Taylor, a fellow servant, who was working by her side, to stop the mangle, but Miss Taylor did not hear her, or failed to understand what was the matter; that she called to her again, and before Miss Taylor could stop the machine the plaintiff's hand was pulled into the rollers, and she thus sustained the injury complained of.

It appears that the guard roller in question had a play or uplift of about four inches, and the machine was thus constructed in order to permit the articles, which were being ironed, to go under it and into the rollers.

The defendant produced several disinterested witnesses, men who were skilled in the laundry business, and who were acquainted with the latest and best laundry machines in use at the time of the plaintiff's injury, who testified, without exception, that the machine in question was the latest and best one then in use, and that the roller guard with which it was equipped was the latest and best safety device known and in use on such machines. The only testimony to the contrary was the evidence of one Birdie Welburn, who testified over the defendant's objection that in her opinion a stationary guard was safer than a roller guard. Her testimony was clearly incompetent, and should have been excluded by the trial judge.

It appears from all of the evidence contained in the bill of exceptions that the real cause of the plaintiff's injury was the accident of her getting her fingers caught in the fringe of the bed spread which she was feeding into the mangle, so that she could not extricate them, and the failure of the girl who was working with her to hear or heed her cry for assistance in time to prevent her hand from being drawn into the machine. Upon this point plaintiff testified as follows: "Q. The time you were in-

jured, Miss Taylor was working on the same side of the mangle with you? A. Yes, sir. Q. And when you had your hand caught in the fringe you spoke to her and asked her to stop the mangle? A. I asked her to stop the mangle. Q. And she didn't hear you? A. No, sir. Q. And you asked her the second time, and she didn't hear you? A. No, sir. Q. That is right, is it? A. Yes, sir. Q. And it was Mr. Drake who stopped the machinery? A. Jennie stopped the mangle. Q. Oh, after you spoke to her two or three times? A. Yes, sir."

From the evidence above quoted, together with other facts shown by the record, it seems clear that the plaintiff failed to prove any of the acts of negligence on the part of the defendant charged in her petition. In *Omaha Bottling Co. v. Theiler*, 59 Neb. 257, it was said: "The measure of defendant's duty to its servants was the care required by the usual and ordinary usage of the business. The standard of due care is the conduct of the average prudent man. The appliances of the company were those in common and general use. Handled with ordinary care they were not dangerous. This being indisputably established, it follows that the negligence alleged in the original petition is without any foothold whatever in the proof."

The foregoing fully describes the situation in the case at bar. Indeed, all the cases agree that employers are not insurers of the safety of their employees. Absolute safety seems to be unattainable, and therefore employers are liable for the consequences, not of injury, but of negligence. The master does not guaranty the safety of his servants; he is not bound to furnish them with an absolutely safe place in which to work; but is bound simply to use reasonable care and prudence in providing a reasonably safe place in which, and reasonably safe appliances with which, to work. So far as the evidence in this case goes, it seems to establish, beyond question, that the defendant had discharged that measure of duty toward the plaintiff. The case seems to be one of those where the proximate cause of the injury was an unavoidable accident, and not the fault

or negligence of the defendant, and there is nothing in the record from which reasonable minds can reach any other conclusion. We are therefore of opinion that defendant's motion to direct a verdict in its favor should have been sustained. This view of the case renders it unnecessary for us to discuss any of the other errors assigned.

The judgment of the district court is therefore reversed and the cause is remanded for further proceedings.

REVERSED.

FAWCETT, J. not sitting.